IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-CV-00554-REB-BNB

ROCKY MOUNTAIN CHRISTIAN CHURCH, a Colorado nonprofit corporation,
ALAN AHLGRIM, Lead Pastor,
DONALD BONDESON, Discipleship Pastor,
BARB EVANS, Director of Women's Ministry, and
DAVID PAGE, Elder,

       Plaintiffs,

and

UNITED STATES OF AMERICA, Intervenor,

       Intervenor Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, COLORADO,

       Defendant.

---

## PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs respectfully file this Opposition to Motion For Summary Judgment.

### A. Introduction.

Defendant ("BOCC" or the "County") claims that no church has a "constitutional right to be free from reasonable zoning regulations." (*See* Mot., 9, 14 and 24, *quoting Grace United v. City of Cheyenne*, 451 F.3d 643, 652 (10th Cir. 2003)). This is a truism with no relevance to this case. Rocky Mountain Christian Church ("RMCC") spent hundreds of thousands of dollars trying to comply with the requirements of the Boulder County Land Use Code ("Code"), engaging planners, lawyers, architects and engineers, attending numerous meetings with County officials, neighboring landowners and

731336.2 5:18 PM

community associations, and based upon such meetings, making substantial changes to its development proposal.  (Ex. 1, Thielen Aff., ¶¶13-21).  In response, its religious beliefs were ridiculed by County officials, it was subjected to arbitrary and changing demands, and its Application SU-04-008 (the "Application") was denied for reasons inconsistent with the BOCC's treatment of more traditional religious organizations and secular institutions.  (*See* Sections C.2, C.3 below).

This arbitrary and hostile treatment is especially pernicious given the BOCC's acknowledgment that any group wanting to hold regular religious services anywhere in the County must first obtain approval of the County.  (Ex. 2, BOCC Dep., 34:10–36:19). In other words, the County imposes a system of prior restraint on religious exercise, speech and association.  Although the BOCC states churches are a use by right in 12 of 13 zone districts, it conveniently omits that this only applies to churches with an occupant load less than 100, and even those churches are subject to site plan review. (*Id.*).  A church meeting the "use-by-right" criteria is too small to undertake many common religious practices and programs.  (Ex. 1, Thielen Aff., ¶22).  Even if it could, the County acknowledges the site plan review process has sometimes imposed conditions that are "too prohibitive" so the applicant "chose not to build," (Ex. 3, Site Plan Review, "Limits of SPR"), and the County may deny a site plan application.  (Ex. 4, Code, § 4-807).  The average American church has 419 members.  *Yearbook of American and Canadian Churches 2007*, 385 (Eileen W. Lindner ed., Abingdon Press 2007).  All but the smallest churches are therefore subject to special use review under Section 4-600 of the Code, the procedure which applied here.

By asking to deviate from this Court's standards for summary judgment motions and offering a general statement of "undisputed facts," as opposed to setting forth undisputed facts under each claim, the BOCC conveniently hides the fact that most of

731336.2 5:18 PM

2

its "undisputed facts" are not relevant to any of the claims.  While it is undisputed that RMCC is a large, successful church that received prior approvals, and that much religious activity occurs at it existing facility (*see* Mot., 1-3), those facts do not negate any element of any claim.  More importantly, they do not negate the fact that space constraints have forced RMCC to curtail other religious activities and the practices of worship, fellowship, discipleship, ministry and evangelism that are central to its religious mission and that would have occurred had the County not denied the Application. (Ex. 5, Ans. to Interrogs., 1; Ex. 6, Supp. Ans. to Interrogs., 1).

### B.  BOCC'S Undisputed Facts are Disputed or Irrelevant.

1.      *RMCC is Large.*  The BOCC makes much of size, describing RMCC as a "mega church," regularly holding services for "over 2,000 people."  (Mot., 1).  No claim under the Religious Land Use and Institutionalized Person Act of 2000, 42 U.S.C. § 2000cc ("RLUIPA"), or the constitution depends upon size.  Nor is RMCC unusual. The BOCC's expert reports 24 other churches with attendance over 2,000 in the Front Range Colorado Metropolitan Area.  (Ex. 7, Seieroe Report, 29).

2.      *Religious Activities Occur at the Existing Facility.*  After listing RMCC's activities, the BOCC asserts that  these activities "continue to take place at a site and in buildings approved by the County." (Mot., 3).  This is irrelevant.  Multiple witnesses testified that other religious activities have been cut short, substantially harmed, or completely precluded due of lack of space and the County's denial.  (*See* Section C.4. below).  The BOCC need not extinguish (or even burden) *all* of RMCC's religious exercise in order to burden it "substantially."  Recognizing this, the County ignores RMCC's discovery response describing religious activities that have been prevented or severely restricted.  (*See* Ex. 5, Ans. to Interrogs., 1; Ex. 6, Supp. Ans. to Interrogs., 1). This negative impact on religious activities cannot be fairly described as undisputed.

3

3.      *Expansion proposal: The County presents a deceptive and partial picture of RMCC's motives.*  Highlighting what is termed a "Double Vision," the BOCC suggests that the Application "not coincidently" would double the size of the Niwot Campus, as if it were the only explanation for the Application.   (Mot., 4).   In fact, RMCC provides numerous facts establishing its need for expanded facilities, including projected church growth (Ex. 8, RMCC Dep., 218:14–219:2), severe restriction on present religious practices (*see* Section C.4. below), and the need for a facility where a majority of even the present congregation could meet at the same time, to engage in religious activity. (Ex. 9, Ahlgrim Dep., 145:4–11; Ex. 10, Page Dep., 95:12–20).   Well before "Double Vision," RMCC had advised the County in 2002 of its need for a "multiuse community building."  (Ex. 1, Thielen Aff., 11).  By omitting this additional evidence, BOCC attempts to conceal evidence that precludes summary judgment in its favor.  Similarly, the BOCC quotes only a portion of Pastor Ahlgrim's religious views, leaving the Court with the impression that RMCC does not need a larger facility, but simply wants one.   Not only does the omitted testimony alone preclude summary judgment, but by challenging the sincerity of the Pastor's claim that the Church needs to expand, the BOCC generates – rather than avoids – a triable issue of fact.

4.      *Related Churches:*  Under the heading "Beyond the Niwot campus" the BOCC, again, distorts the facts.  First, it suggests such church plants are a reasonable alternative for RMCC's members.  RMCC's church plants are outside Colorado and in Greeley, Fort Collins, Thornton, Broomfield and Reunion, Colorado, (Ex. 8, RMCC Dep., 46: 2-11, Ex. 4).  RMCC testified unequivocally:  plants are to start new congregations, not to relieve overcrowding in Niwot.  (*Id.* at 47: 5-21).  They do not provide reasonable alternatives for the vast majority of RMCC members, more than 70% of whom live within seven miles of RMCC.  (Ahlgrim Dep., Ex. 9, 118:19–23; 119:2–4).

Second, the BOCC highlights RMCC's new Frederick facility, citing testimony out of context to suggest that it "will solve space problems at the Niwot Campus for the immediate future." (Mot., 6).  This ignores testimony that the Frederick Campus was to "set up a facility for the tri-town area," and that while it would alleviate overcrowding "on a temporary basis," "it was not a permanent fix or an answer to the crowding, or for the programming needs that we have at the Niwot campus."  (Ex. 8, RMCC Dep., 72: 8-18). RMCC testified repeatedly that Frederick is designed to serve new residents in Weld County (*Id.* at 51:3-5, 60:11-14, 66:11-17, 209:9-10), which is projected to add almost 200,000 residents between 2005 and 2025.  (Ex. 11, Population Projections).  There is a factual dispute on this issue.

The County asserts as undisputed "that it is not part of RMCC's religious belief that it must meet at one particular location."  (Mot., 6).  This is both irrelevant and misleading.  Pastor Ahlgrim responded "no" when asked if RMCC believes "it must be – or meet at one particular location?"  (Ex. 9, Ahlgrim Dep. 129:6-9).  The question is best understood as asking whether RMCC believes its religious practices must occur in one sacred location, like many Muslims believe a *hajj* must occur in Mecca.  RMCC does not believe there is one sacred location at which it must meet, but it does believe the congregation needs to meet together.[1]   At the barest minimum, the BOCC's characterization of this evidence requires an inference in its favor to which it is not entitled on a summary judgment motion.

5.    *No Application Elsewhere in the County.*  The BOCC asserts RMCC has not looked for property "on which to build a church from the ground up elsewhere in Boulder County."  (Mot., 6).  This is a red herring.  Asked to identify any area within the

---

[1] (Ex. 5, Ans. to Interrogs. No. 13, at 31-32) (Church's primary purpose is "to be a full family ministry, thereby able to meet the needs of its congregation in one location"); *see also* Ex. 8, RMCC Dep., 38:20–39:3 (explaining religious importance of congregation worshiping in one location), 89:12–22 (explaining religious importance of families worshiping in one location).

County where such a facility *could* be developed, the BOCC first objected that RMCC did not need such large facilities, apparently assuming it knows best the space required for RMCC's liturgical needs.  (Ex. 12, Def's Ans. to Interrogs. No. 5, at 1–2).  It then failed to identify a single site.  (*Id., see also* BOCC Dep., Ex. 2, 95:11–19).

### C.  Relevant Facts Omitted by the County.

1.    *History of Zoning Applications*.  RMCC's Bylaws state its primary purpose "is to exalt Jesus Christ, *impacting Boulder County* and beyond."   (Ex. 13, Bylaws (emphasis added)).  Attesting to the demand for religious services in the County, weekly attendance now exceeds 2,000.  RMCC acquired property in Niwot (the "Property") in parcels of 15 acres in 1985, 35 acres in 1994, and five acres in 2004.  (Ans. to First Three Claims ("Ans."), ¶ 58).  The Property is less than 1,500 feet from Niwot High School which serves 1,200 students.   (Am. Comp., ¶ 49, Ans., ¶ 49).   RMCC constructed a church before special use review was required.  (Ex. 14, SU-97-12 Staff Report, 1).  With each additional use or change, it applied for special use approvals, including applications SU-93-13 (pre-school), SU-94-16 (Mom's Day Out program), SU-97-12 (increasing building size and starting religious school (the "School")), SU-00-21 (adding sixth grade), and SU-02-08 (increasing the School to 380-students, K-8 facility, and approving temporary modular units).  (Ex. 15, SU-04-008 Staff Report, 3-5).

Approval of its 1997 application was conditioned upon limitations in the School size, combination of two parcels, and granting of a 14-acre conservation easement across the northern portion of the Property.  (Ex. 16, Resolution 98-30, at 2).  A development agreement between the BOCC and RMCC included an approved site plan depicting the easement and bearing the following designation on the western, undeveloped portion of the Property:  "FUTURE BUILDING SITE, Subject to County Approval." (Ex. 17, Dev. Ag., at Ex. B).  The agreement provided that "All property not

shown as developed or developable property shall remain in its existing undeveloped condition until such time as future development is approved." (*Id.* at 2).

The temporary modular units were approved in 2003 for only a three-year period with the requirement that the Church submit an application for more permanent facilities. (Ex. 18, Resolution 2003-54, at 2). RMCC advised the BOCC that the future application would include a request for "a multi-use community building." (Ex. 19, SU-02-08 Staff Report, 3). Planning Commission and staff recommended denial of SU-02-08 because they wanted to see a master plan for the Property. (*Id.* at 7). At the hearing before the BOCC, Commissioner Danish asked that the next application include a proposal for a master plan for the Property. (Ex. 20, Danish Dep., 46:16-47:9).

To comply with the demand for a final master plan, RMCC hired consultants to project future space needs and other professionals to prepare detailed submittal requirements. (Ex. 1, Thielen Aff., ¶¶ 14, 16). The cost of these efforts exceeded $700,000. (*Id.*, at ¶¶ 16, 17). RMCC had numerous meetings with the County staff and various community and neighborhood associations. (*Id.*, at ¶ 18). It then made many modifications to the proposal, including dropping its request to increase the School to 540 students. (Ans., ¶ 21). This modification was made after being told by the Land Use Director that the increased student population was the primary problem the County had with the Application. (Koopmann Aff., Ex. 21, ¶ 44).

2. *Hostility and Animus.* Despite extensive efforts of RMCC to comply with the Code and other County demands, the BOCC denied almost all of the Application. (Ex. N, Resolution 2006-23, at 4)[2]. RMCC met with outright expressions of hostility and many actions from which hostility and animus may be inferred. (Ex. 5, Ans. to Interrogs., 2). Planning Commissioner Morrison stated that it is a long-standing goal of

---

[2] Exhibits designated by a letter are attached to the County's Motion.

the County to stop the growth of the Church, made derogatory remarks concerning religious education, and sneeringly told the Church's professional planner to "bring in your Christians." (*Id.* at 16, 17). After watching videotape of RMCC's Sunday school program, Commissioner Mayer said his father, who superintended Sunday school, "would be rolling over in his grave." (*Id.* at 16). Although not said to RMCC, Commissioner Danish told Gina Hyatt there won't be any more mega-churches in Boulder County. (*Id.* at 17). He also characterized lawful applications in 2000 and 2002 as the County's "being nickeled and dimed by them in these smaller approvals." (Ex. 20, Danish Depo., 43:11-12).

Actions from which hostility may be inferred include the BOCC's ignoring Colorado's process for reviewing quasi-judicial decisions, and instead suing RMCC in federal court. (Ans. ¶¶ 121-125). While dismissing that lawsuit on other grounds, Judge Krieger indicated the BOCC had failed to establish its authority to bring the lawsuit. (Ex. P, Order, 4-6). The County has never – before or since – sued an applicant in federal court. (Ex. 22, Ans. to Req. for Ad. No. 1). The County also imposed many requirements not contained in the Code, including that RMCC not submit any more piecemeal applications but instead submit a master plan, (Ex. 20, Danish Depo., 43: 11-12; Ex. 19, SU-02-08 Staff Report, 7), and that it submit a detailed space plan outlining the religious activities which would take place in every part of the proposed facility. (Ex. 1, Thielen Aff., ¶¶ 19-21). The County fired a videographer it had hired to videotape RMCC after he stated he was a Christian. (Ex. 6, Supp. Ans. to Interrog. No. 2, at 7–8). The fact that RMCC was treated differently than other applicants, as described below, suggests hostility. Finally, the BOCC irrationally denied the Application because it would not preserve a certain portion of the Property for agricultural use, even though the County had previously designated that portion in its

Comprehensive Plan (the "Plan") as a "Public/Quasi-Public Facility", (Koopmann Aff., Ex. 21, ¶ 34), and had previously described it in an approved site plan as a future building site.  (Ex. 17, Dev. Ag., at Ex. B).

3.    *Disparate Treatment.*    RMCC has described in detail the evidence demonstrating it has been treated differently than two secular uses located in the same zone district, Alexander Dawson School ("Dawson") and the Agricultural Heritage Center (the "Heritage Center").  (*See* Church's Supp. Statement (#114), (hereinafter "Statement"); Church's Reply (#123) hereinafter ("Reply")).  It also described how the method of determining whether the Application constituted an over-intensive of land was changed from the method generally used, and from the method used to approve applications for Faith Lutheran Community Church ('Faith Lutheran") and Columbine Unity Church ("Columbine").  (*See Id.*).  The Church incorporates herein the evidence described in those filings.  The County's reasons for denial included the fact that RMCC's facility was located on lands designated in the Plan as agricultural lands of national importance and within the Niwot Buffer Zone.  (Ex. N, Resolution 2006-23, 6-7).  However, the BOCC has approved numerous secular and religious development applications on lands bearing the same designations.  (Ex. 22, Ans. to Interrogs., No. 1, No. 2, Ex. A (listing multiple approvals in each category)).

4.    *Substantial burden.*  The County's denial of the Application has imposed many burdens on religious exercise, free speech, and assembly, including:

(a)    Sermon time has been reduced, which was "very painful and significant." (Ex. 9, Ahlgrim Dep. 57:7–60:4, 42:11; Page Dep., Ex. 10, 79:11–12, 82:17–83:11; Ex. 8, RMCC Dep., 127:15–128:6).

(b)    Worship has been cut short.  (Ex. 9, Ahlgrim Dep., 58:10–11; Ex. 8, RMCC Dep., 104:2–15, 114:12–13, 117:5–6).

9

(c)    Communion time, including time for reflection has been reduced. (Ex. 9, Ahlgrim Dep., 58:22–59:2; Ex. 10, Page Dep., 79:12–13; Ex. 8, RMCC Dep., 114:14–15, 116:21–117:5, 118:8–11).

(d)    Children are prevented from attending children's church classes, or forced to meet in hallways.  (RMCC Dep., Ex. 8, 19:17–20:18).

(e)    Groups are "constantly" turned away from using the church building for meetings.  (Ex. 9, Ahlgrim Dep., 96:7–97:1).

(f)    Less than 20% of the congregation can gather for feasts, even though "[e]ating together is a huge part of the Christian and Jewish heritage." (Ex. 9, Ahlgrim Dep., 144:2–145:20; *see also* Ex. 10, Page Dep., 95:3–20).

(g)    Baptisms have been restricted, even eliminated from two of three services.  (Ex. 9, Ahlgrim Dep, 28:23–29:13; Ex. 10, Page Dep., 85:23–86:42, 88:19–24).

(h)    Missionaries have been prevented from addressing the congregation during Sunday services, or given only brief mention.  (Ex. 9, Ahlgrim Dep., 61:9–62:4; Ex. 10, Page Dep., 98:4–20;   Ex. 8, RMCC Dep., 124:12–125:5; *see also* Ex. 6, Supp. Ans. to Interrogs. No. 2 at 2 listing nine specific missionaries).

(i)    A twentieth anniversary celebration and gathering had to be canceled because RMCC had no fellowship space large enough to accommodate its members.  (Ex 1, Thielen Aff., ¶ 23).

(j)    Funeral services have been limited in deeply disturbing ways.  In the words of Donald Page, "I've attended funerals of friends where part of the activities were conducted in hallways.  It's not appropriate to do that with the Church forced to put caskets in the hallways." (Ex. 10, Page Dep., 95:21–23).

(k)    RMCC has been limited in its ability to host weddings. (Ex. 10, Page Dep., 95:24–96:7; Ex. 8, RMCC Dep., 131:10–25, 231:3–8).

(l)    Adult Sunday school classes have been canceled because there is no meeting space (Ex. 10, Page Dep., 97:3–20).

(m)    The School is growth-limited.  (Ex. 10, Page Dep., 59:1-4).

In sum, all of the foregoing facts show that a reasonable jury could find that the BOCC's denial of the Application not only reflected impermissible disparate treatment across religious lines, but imposed impermissibly heavy burdens on RMCC's religious exercise and expressive association.[3]

### D.  Argument.

To avoid summary judgment, RMCC need only demonstrate disputed facts supporting each element of its claims. *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The factual record must be viewed in the light most favorable to RMCC.  *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007).  The County simply ignores substantial evidence of burden, hostility, inconsistency, and discrimination, in order to paint a fundamentally misleading picture of the factual record.  It also misstates elements of the claims.  On each claim, there is factual evidence supporting each element sufficient to preclude summary judgment.

I.    *Third Claim: Impermissible Delegation.*

RMCC moved for summary judgment on this claim, and the facts and arguments set forth supporting its motion establish that RMCC, not the BOCC, is entitled to summary judgment.  (*See* Pl.'s Combined Opening Br. (#64), Pl.'s Combined Reply Br. (#80); Statement; Reply).

---

[3] For all these facts, and additional factual details relating to the substantial burden on religion, see Ex. 5, Ans. to Interrogs. No. 1 and No. 2, as well as Ex. 6, Supp. Ans. to Interrogs. No. 1 and No. 2.

II.     *Fourth Claim: County Violates RLUIPA "Equal Terms" and "Discrimination" Provisions.*

a.      <u>UNDISPUTED Burden</u>:  RMCC agrees that it bears the burden of proof under both the equal terms (Section 2(b)(1)) and nondiscrimination (Section 2(b)(2)) provisions of RLUIPA.  The burden on the present motion is only of production, not persuasion – RMCC need only produce evidence from which a reasonable fact-finder *may* conclude that RMCC has satisfied the elements set forth below.  *Concrete Works*, 36 F.3d at 1518.

b.      <u>DISPUTED Elements</u>:  The BOCC's one paragraph statement of elements is misleading.  First, it conflates two distinct provisions of RLUIPA invoked with RMCC's fourth claim:  the equal terms provision of *Section 2(b)(1)*, which prohibits treating a religious assembly or institution on less than equal terms than a nonreligious assembly or institution, and the nondiscrimination provision of *Section 2(b)(2)* which prohibits discriminating against any assembly or institution on the basis of religion or religious denomination.  42 U.S.C. § 2000cc-2(b)(1), (2).  RMCC makes claims under both subsections, (*see* Am. Comp., ¶ 163), and each requires independent analysis.

(1)     <u>Equal Terms Elements</u>.  In accordance with the text of Section 2(b)(1), RMCC must satisfy the following elements for an equal terms claim:  (1) that RMCC is a "religious assembly or institution," (2) that RMCC is subject to a "land use regulation," (3) that such regulation has been imposed or implemented "in a manner that treats RMCC on less than equal terms," (4) with "a nonreligious assembly or institution." RLUIPA, § 2(b)(1).  *See also Primeria Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1307–08 (11th Cir. 2006).

It is important to emphasize what this language does not provide.  It does not include any requirement that RMCC prove "animus," or that RMCC was "similarly situated" to some other contemporaneous use; and it does not allow the County to

escape liability if it can satisfy the elements of strict scrutiny.[4]  (*See* Mot., 8).  These additional requirements, which some courts have mistakenly grafted onto the statute, are based on a mistaken understanding of the function of Enforcement Clause legislation, and its relationship to the underlying constitutional protections it is designed to enforce.

To be sure, RLUIPA's equal terms provision is designed to forbid governmental discrimination as between religious and nonreligious activities, which is forbidden by multiple, overlapping constitutional protections.[5]  Although similar in their basic thrust, those constitutional protections are not identical, making it difficult, if not impossible, to incorporate all of their various requirements in a single enforcing statutory provision.  In any event, even if it were possible, such exactitude is not required by the Enforcement Clause.[6]  Instead, Congress may prohibit – and in the case of the equal terms provision, has prohibited – a range of conduct that includes mostly unconstitutional conduct, even if it also prohibits some constitutional conduct.[7]  It does so here by drafting statutory language that represents something of a lowest common denominator among the enforced constitutional protections, eliminating some of the more onerous requirements that would apply to some of the underlying constitutional claims (e.g., the "similarly

---

[4] As it happens, even if these were requirements, they would be satisfied in this case.

[5] *Midrash Sephardi v. Town of Surfside,* 366 F.3d 1214, 1238-39 (11th Cir. 2004) (discussing overlapping Free Exercise, Establishment, and Equal Protection Clause underpinnings of equal terms and discrimination provisions); *Freedom Baptist Church v. Tp. of Middletown,* 204 F. Supp. 2d 857, 869-70 (E.D. Pa. 2002) (same).

[6] *See Tennessee v. Lane,* 541 U.S. 509, 533 n.24 (2004) ("Congress 'is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment,' and may prohibit 'a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text.'") (quoting *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 81 (2000)).

[7] *City of Boerne v. Flores,* 521 U.S. 507, 518 (1997) ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power *even if* in the process it prohibits conduct which is *not itself unconstitutional*….") (emphasis added).  *See also id.* at 532 ("Preventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that *many* of the laws affected by the congressional enactment have a *significant likelihood* of being unconstitutional.") (emphasis added).

situated" or intentional discrimination requirements of an Equal Protection Clause claim).[8]   It is enough for an equal terms plaintiff simply to satisfy the plain language of the statute; in this way, Congress makes it simpler and easier in relation to the underlying constitutional protections for plaintiffs to sue – the very purpose of civil rights enforcement legislation.

Therefore, the Court should not impose upon itself a constraint to apply RLUIPA so that it extends no farther than the least protective constitutional prohibition that it would enforce, because the Enforcement Clause does not impose such a constraint. Instead, the Court should apply RLUIPA in accordance with its plain language – which does not include the additional requirements and defenses that the County manufactures for its own benefit, and which instead calls for a broad construction to effectuate its remedial purpose.[9]

(2)    <u>Nondiscrimination Elements</u>.  According to Section 2(b)(2), RMCC must satisfy the following elements to make out a nondiscrimination claim: (1) that RMCC is an "assembly or institution"; (2) that RMCC is subject to a "land use regulation"; (3) that such regulation has been imposed or implemented "in a manner that discriminates against [RMCC] on the basis of religion or religious denomination."  RLUIPA § 2(b)(2). To the extent this provision forbids discrimination "on the basis of religion," it covers

---

[8] Two courts have expressly rejected any requirement to show "similar situation" beyond the statutory requirement to show that the uses to be compared are "assemblies" or "institutions."  *Vision Church, United Methodist v. Village of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2007); *Midrash Sephardi v. Town of Surfside,* 366 F.3d 1214, 1230-31 (11th Cir. 2004).  That is similar enough for Congress.  *See* 46 CONG. REC. S7774-01, at S7775 ("Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes.")

[9] *See* RLUIPA § 5(g) ("BROAD CONSTRUCTION - This Act shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this Act and the Constitution.").  *See also Cottonwood Christian Ctr. v. Cypress Redevel. Agency*, 218 F. Supp. 2d 1203, 1230-31 (C.D. Cal. 2002) ("By passing RLUIPA, Congress conclusively determined the national public policy that religious land uses are to be guarded from interference by local governments *to the maximum extent permitted by the Constitution*.") (emphasis added).

much of the same territory as the equal terms provision and enforces the same constitutional prohibition against religious / secular discrimination. To the extent it forbids discrimination "on the basis of … religious denomination," it enforces the closely related constitutional prohibition against religious / religious discrimination.[10] Moreover, the "similarly situated" requirement does not even arguably apply to Section 2(b)(2), as no court has ever applied it.

c., d. <u>Supporting Facts.</u>[11] The first two elements of RMCC's claims under RLUIPA § 2(b)(1) and § 2(b)(2) are identical. Because the County apparently does not challenge RMCC's status as a "religious assembly or institution," nor that RMCC has been subjected to a "land use regulation," those elements are satisfied. (Mot., 8–11).

The County has applied its own special use regulations in a manner that treated RMCC on less than equal terms with *two* secular assembly uses in the same zoning district and on lands designated in the Plan as agricultural lands of national importance, the Dawson School and the Heritage Center. (See Statement, 7-9, and testimony and county documents attached thereto as Appendices 1-2).

The differential treatment of RMCC and Dawson is especially striking. The Land Use Director testified to the similarity of the properties surrounding the private, non-religious Dawson and those surrounding RMCC. (Ex. 23, Billingsley Dep., 115:19-116:14). Dawson, with 420 students, received special use approval to expand the facilities on its 65-acre parcel to 197,000 square feet ("sf") of developed space, including a 30,000 sf gymnasium, a renovated art center of 20,000 sf located in the old

---

[10] *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *see, e.g., Hollywood Community Synagogue v. City of Hollywood,* 430 F. Supp. 2d 1296, 1320-21 (S.D. Fla. 2006) (rejecting motion to dismiss Section 2(b)(2) claim).

[11] Because RMCC has the burden of proving only that material issues of fact are disputed, the "c" and "d" paragraphs responding to the County are combined. Most of the County's claimed undisputed facts sections merely incorporated the general fact section, which RMCC has responded to in Section B above.

gymnasium, and new classrooms totaling approximately 33,600 sf.    (Ex. T, Resolution 96-26, at 1-2).  RMCC currently has approximately 108,600 sf of permanent facilities and 7,200 sf of modular units on 55 acres and requested authority to increase its facilities, adding a 28,000 sf gymnasium, a 6,500 sf chapel, new classrooms and enclosed gallery space connecting the various facilities.  (Ex. 15, Staff Report, 2).  The BOCC separately considered and approved portions of the Application, but denied the gymnasium and all classroom space except for 10,000 sf to replace the modular units. The remainder was determined to be too "urban" for a rural area.  (Ex. N, Resolution 2006-23, 5).    The 420-student secular Dawson school was allowed a gym and additional classrooms, while the 380-student RMCC school was denied a smaller gymnasium and additional classrooms on comparably sized parcels in the same district under the same procedures and criteria.

While RMCC does not have to show the two schools are similarly situated to prevail, these facts are more than enough to create a factual dispute if that element does apply.[12]  *Compare Primera Iglesia*, 450 F.3d at 1311 (comparators not similarly situated when located in different zoning district and applying for different types of approvals).  The highly similar situation of the two private schools is much greater than entities found to be "similarly situated" in Equal Protection cases[13].

---

[12] The County points to traffic generation to justify this differential treatment, but the BOCC did not find any violation of Code Section 4-601A.7. which prohibits "undue traffic congestion or traffic hazards," (Ex. N, 2006-23, at 5-7).  The argument that the Dawson approval was part of a larger preservation effort, involving the County's open-space purchase of other land from Dawson is contradicted by testimony of a commissioner who acted on the Application.  He testified that the County the application was approved based only on the special use criteria and Dawson received no special consideration due to the transaction.  (Ex. 24, Stewart Dep., 22:17-23:20).

[13] *See Christian Gospel Church v. San Francisco*, 896 F.2d 1221, 1226 (9th Cir. 1991) (comparing church with school and community center); *Cornerstone Bible Church v. Hastings*, 948 F.2d 464, 471 (8th Cir. 1991) (comparing church to chapter of Alcoholics Anonymous and Masonic Lodge); s*ee also Midrash*, 366 F.3d at 1231 (comparing private clubs and lodges with a synagogue).

The County admits RMCC is on less than equal terms with certain nonreligious assemblies or institutions, namely public schools.  (Ans. to Remaining Claims, ¶ 5); *see also* Colo. Rev. Stat. § 22-32-124. The fact that schools receive favorable treatment as a matter of state law does not eliminate the County's ability to treat RMCC at least as well under its own laws, in order to comply with RLUIPA Section 2(b)(1).  Just because state law sets the bar high for the treatment of "a nonreligious assembly and institution" in the same zone does not remove the County's obligation under Section 2(b)(1) to meet that same high bar in the County's treatment of "a religious assembly or institution."[14]

The County has also implemented the special use criteria in a manner that discriminates against RMCC "on the basis of … religious denomination."  *See* Relevant Facts, Section C.3 above.  The County has accomplished this discrimination by using a method of determining whether RMCC's Application constituted an over-intensive use of land different than the method used to make the same determination for the special use application of Faith Lutheran, located in the same zoning district and on agricultural land of national importance.  (*See* Statement, 4-7, and testimony and county documents described therein and attached thereto as Appendices 1-2; Reply, 4-6).

III.    *Fifth Claim: County Violates RLUIPA "Substantial Burden" Provision.*

a.    <u>DISPUTED Burden</u>.  RMCC bears the burden of producing *prima facie* evidence to support its claim and the burden of persuasion on the issue of whether its

---

[14] *See F.O.P. v. City of Newark,* 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.) (finding City violated Free Exercise Clause by providing medical exception to no-beard policy, but declining to provide religious exception; rejecting City's argument that it should matter that medical exception was required by federal law); *Ackerly Comm. of Mass., Inc. v. City of Cambridge*, 88 F.3d 33, 34 (1st Cir. 1996) (city violates First Amendment when "combined effect of the local ordinance and state [grandfathering] law" imposes restrictions which discriminate between certain speakers); *Open Homes Fellowship v. Orange County*, 325 F. Supp. 2d 1349, 1362-63 (M.D. Fla. 2004) (finding County violated Equal Protection Clause where state law required favorable treatment of secular institution, and County failed to treat religious institution as well).

religious exercise has been substantially burdened, and the BOCC bears the burden of proof on all other elements.  42 U.S.C. § 2000cc(a)(1), § 2000cc-2(b).

b.    DISPUTED Elements.    The County claims that the "effectively impracticable" standard for defining a "substantial burden," manufactured by the Seventh Circuit in its decision in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003) ("CLUB"), governs in the Tenth Circuit.  That is simply false.  Although the Tenth Circuit in *Grace United* cited *CLUB* for the proposition that RLUIPA's legislative history indicates that "substantial burden" was not intended to be broader than the Supreme Court's articulation of the concept, 451 F.3d at 662, that is a far cry from adopting the dubious "effectively impracticable" standard.  Indeed, the "effectively impracticable" standard has not been adopted in any precedential opinion of any other federal Court of Appeals – least of all the Tenth Circuit – and has been dramatically narrowed by the Seventh Circuit itself. [15]

Instead, the Tenth Circuit in *Grace United* largely approved a jury instruction reflecting a "substantial burden" standard that (unlike *CLUB*) relies on Supreme Court jurisprudence defining that key term:

> A government regulation "substantially burdens" the exercise of religion if the regulation:    (1) significantly inhibits or constrains conduct or expression that manifests some tenet of the institutions belief; (2) meaningfully curtails an institution's ability to express adherence to its faith; or (3) denies an institution reasonable opportunities to engage in

---

[15] *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005) (Posner, J.) (limiting *CLUB* standard to facial challenges, and noting that a burden need not be "insuperable" to be "substantial").  *See also United States v. Maui County*, 298 F. Supp. 2d 1010, 1017 (D. Haw. 2003) (*CLUB*'s "facial challenge" standard did not apply to "an as-applied challenge" to permit denial).  The Eleventh Circuit has squarely criticized and rejected this standard because it "would render [RLUIPA Section 2(b)(3)(A)]'s total exclusion prohibition meaningless."  *Midrash Sephardi,* 366 F.3d at 1227.  The Ninth Circuit has explained that, although its own "oppressive to a significantly great extent" standard may occasionally yield results consistent with those under the "effectively impracticable" standard, the Ninth Circuit's standard is "more lenient."  *Guru Nanak Sikh Soc. v. County of Sutter*, 456 F.3d 978, 989 n.12 (9th Cir. 2006).  *See, e.g., San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).  This Court should reject BOCC's invitation to depart from Tenth Circuit and Supreme Court precedent in favor of the "effectively impracticable" standard.

> those activities that are fundamental to the institution's religion. Thus, for a burden on religion to be "substantial," the government regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution is insufficient.

*Grace United*, 451 F.3d at 660.[16] This definition of "substantial burden" was further supported by Tenth Circuit decisions under RFRA. *Id.* at 662 (citing *Thiry v. Carlson,* 78 F.3d 1491, 1495 (10th Cir. 1996), and *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir. 1995)). And other jurisdictions, also relying on Supreme Court precedent, have formulated definitions of "substantial burden" that very closely resemble the Tenth Circuit's "significantly inhibits or constrains" and "meaningfully curtails" language.[17]

In practice, this has meant that the denial of a special use permit (or similar discretionary prohibition) may impose a "substantial burden," even when the denial does not burden or extinguish *all* of the applicant's religious exercise. *Sts. Constantine & Helen*, 396 F.3d at 901 (burden need not be "insuperable" to be "substantial"). Instead, it is enough if some *subset* of the applicant's religious exercise is either forbidden

---

[16] *Grace United* found only the "fundamental religious belief" portion of the instruction to be in error. 451 F.3d at 662 (citing *Kikumura v. Hurley*, 242 F.3d 950, 960–61 (10th Cir. 2001)). *See* RLUIPA Section 8(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, *or central to*, a system of religious belief.") (emphasis added).

[17] *Guru Nanak*, 456 F.3d at 999 (substantial burdens exist where county actions to a "significantly great extent lessened the prospect" of "construct[ing] a [house of worship] in the future"); *Sts. Constantine*, 396 F.3d at 901 (substantial burden caused by "delay, uncertainty, and expense," of repeated land use applications); *Midrash Sephardi*, 366 F.3d at 1227 ("'substantial burden' is akin to significant pressure" which makes the adherent "conform his or her behavior accordingly"); *Presiding Bishop v. West Linn*, 111 P.3d 1123, 1130 (Or. 2005) (government regulations creates substantial burden where "it 'pressures' or 'forces' a choice" between receiving benefit and foregoing religious precepts).

entirely or limited substantially, in quality or quantity, by the denial.[18]  Such denials do not simply increase the financial cost or decrease the convenience of engaging in certain religious activities; instead, they prevent RMCC from offering certain religious activities at all, forcibly cap the number of people that can participate in the religious activities that remain, and impair the quality of those remaining activities.  And, as detailed below, those activities lie at the core of First Amendment concern – assembling for religious worship, instruction, and fellowship.  This Court should thus reject the County's repeated suggestion (see Mot., 9, 14, 24) that RMCC instead seeks a "constitutional right to be free from reasonable zoning regulations" or "build its house of worship where it pleases."  *Grace United,* 451 F.3d at 652.

c., d.  Supporting Facts.  RMCC has alleged sufficient facts to establish a substantial burden and satisfy two of the three jurisdictional hooks – interstate commerce and individualized assessment.

(1)  Substantial Burden.  Many of the individual restrictions detailed above in Section C.4, Substantial Burden, would suffice alone to create a material issue of fact that RMCC's religious exercise has been substantially burdened.  But the sum of these restrictions shows the burden to be more than merely "substantial," but "severe," curtailing almost every facet of RMCC's religious life.  The County's motion devotes

---

[18] *See, e.g.*, *Westchester Day School v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 547 (S.D.N.Y. 2006) ("By precluding the construction of much needed facilities, defendants significantly interfered with WDS's ability to provide an adequate and effective dual curriculum of Judaic and general studies education, and so limited its ability to retain and attract students and faculty as to imperil its continued existence."); *Living Water Church v. Charter Tp. of Meridian*, 384 F. Supp. 2d 1123, 1333 (W.D. Mich. 2005) (denial of CUP unable to adequately "practice its religious beliefs in its current [leased] location because the facilities are too small for the needs of the congregation and staff."); *and Cottonwood*, 218 F. Supp. 2d at 1212 (detailing restrictions on religious exercise resulting from being forced by permit denial to remain at existing site, including insufficient space requiring church to splinter contrary to its beliefs; to forgo numerous ministries such as child and adult religious education, and to be unable to attract new members).  *See also Alpine Christian Fellowship v. County Comm'rs*, 870 F. Supp. 991, 994–95 (D. Colo. 1994) (finding a denial of special use application for operating a religious school to be a "substantial burden" under Free Exercise Clause, years before RLUIPA).

nary a word to address these concrete, particular limitations on religious exercise, hoping the Court will overlook them as a result of three arguments raised in distraction.

First, the County emphasizes the size of RMCC's present building, 116,000 square feet. This argument has a numerator but no denominator. RMCC's present facility could *in theory* be adequate for some congregations, but it is not adequate for *this* congregation. Large congregations are not exempted from the terms of RLUIPA, as government still has the power to impose heavy burdens on even the largest congregation. Indeed, the larger the institution, the more religious exercise there is to burden, and the likelier that religious exercise will extend into traditionally regulated areas. On the County's view, only small churches with little growth potential enjoy Section 2(a)'s protection (which they wouldn't need anyway), but larger upstarts do not.

Second, the County makes two arguments ((2) and (4)) alleging that separate church facilities, such as the planned Frederick Campus and plant churches, should satisfy RMCC's needs. The County especially trumpets the Frederick Campus as a panacea for all of RMCC's needs, conveniently located in a separate city beyond the County's jurisdiction. But if the mere availability of properties in another jurisdiction could defeat a "substantial burden" claim, then even the heaviest burden within a municipality's power to impose – driving the religious institution entirely out of town – would not meet the standard, and so no burden would. Even the outlier "effectively impracticable" standard is not so demanding. Moreover, the Court should reject the County's paternalism in claiming to know what would best serve RMCC's religious mission. This is particularly true on a motion for summary judgment, in the face of RMCC's contrary evidence. (*See* Sections B.4, Related Churches) above).

Similarly, the County points out that RMCC has no religious belief that require it to operate at a single location, a bare fact exaggerated and taken out of context, as

explained in the Disputed Facts above. Instead, RMCC's religious beliefs strongly support the need to expand at Niwot. In any event, the Tenth Circuit has explained that "religious exercise need not be mandatory for it to be protected under RFRA," or under RLUIPA. *Grace United*, 451 F.3d at 662.

Third, the County argues that RMCC has not applied to "conduct its religious exercise elsewhere," suggesting that RMCC "has the option of building yet another church." (Mot., 15). But the County cannot identify even a single site where RMCC might operate per the Application. (Ex. 12, Def's Ans. to Interrogs. No. 5, at 1–2). Not only do the facts preclude the County's "move elsewhere" argument, the County's legal citations fail to support it. Although the County's emphasizes that *Grace United* noted that the plaintiff could "operate in another area," the County omits that the day care facilities in that case were allowed by right in other zones *within* the jurisdiction. 451 F.3d at 655. Similarly, in the unreported, non-precedential *Lighthouse Inst. For Evangelism, Inc., v. City of Long Beach* decision, the church could "operate [ ] as a church by right in other districts *in the City*." 100 Fed. Appx., 70, 77 (3d Cir. 2004).

Finally, if the Court were to apply the anomalous "effectively impracticable" standard, it should find sufficient evidence to preclude summary judgment for the County on that standard. Many of the County's restrictions explained above render religious activities of RMCC "effectively impracticable." For example, adults are effectively prohibited from Sunday school classes, a complete bar on religious exercise. RMCC is effectively prohibited by the County's zoning laws from meeting together as a congregation, as evidenced by the cancellation of a twentieth anniversary celebration. From these and other facts, a reasonable jury could conclude that RMCC's religious exercise has been rendered "effectively impracticable."

(2)     Jurisdictional Element – Interstate Commerce.     The denial of the Application for a thirty-million dollar construction project is a burden that unquestionably "affects … commerce … among the several States."   RLUIPA § 2(a)(2)(B).   First, the Application qualifies as affecting commerce under *Gonzales v. Raich*, 545 U.S. 1 (2005) which defined economic activity as including "the production, distribution, and consumption of commodities."   *Id.* at 25.   Millions of dollars to be spent on RMCC construction, related payments, use of commodities, and construction contracts, all constitute "economic activity."   *United States v. Grassie*, 237 F.3d 1199, 1204 (10th Cir. 2001) (church activity affects interstate commerce).   Second, courts have found that prohibiting a construction project provides sufficient connection to commerce under Section 2(a)(2)(B).   *See, e.g.*, *Westchester Day*, 417 F. Supp. 2d at 541; *Cottonwood*, 218 F. Supp. 2d at 1221–22.   Third, in the legislative history of RLUIPA, Congress specifically identified construction projects as a covered "economic transaction in commerce." 146 CONG. REC. S7775; H.R. REP. 106-219.   Finally, RMCC incorporates by reference the arguments made in its response to the motion to dismiss [#43 at 26-28]. In contrast to all of this, the County has no contrary authority.

(3)     Jurisdictional Element – Individualized Assessments.     The County's decision denying the Application through the discretionary, case-by-case process created by its ordinance represents a classic burden "imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes … individualized assessments of the proposed uses for the property involved." RLUIPA § 2(A)(2)(C).   In the Tenth Circuit, a "system of individualized exemptions" under the Free Exercise Clause is similarly "one that gives rise to the application of a subjective test … in which case-by-case inquiries are routinely made, such that there is an individualized governmental assessment of the reasons for the relevant conduct that

731336.2 5:18 PM                                    23

invites considerations of the particular circumstances involved in the particular case."
*Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2005) (quotations omitted).
Although the *Grace United* court found no "system of individualized assessments" in the
particular zoning decision challenged in that case, the court emphasized that zoning
authorities lacked any discretion *at all* under the law to grant the variance requested.
451 F.3d at 653-54 (emphasizing that denial of variance as "mandatory," because
Board had "*no authority* to grant a variance for purposes of operating a daycare center
in a residential zone") (emphasis added).[19]

Here, there is more than sufficient evidence to allow a reasonable fact-finder to
conclude that RMCC's Application was denied pursuant to a "system of individualized
assessments."  First, on their face, the special use criteria of the ordinance contemplate
consideration of subjective, case-by-case factors.[20]  Second, the County's interrogatory
response confirms the individualized character of these decisions in practice.[21]  Third,

---

[19] In elaborating the meaning of "individualized assessments," the Court should take care to avoid conflating "substantial burden" and discrimination-type claims.  As two Courts of Appeals have now explained, the "substantial burden" provision is designed to apply strict scrutiny when there is an especially high *risk* of discrimination (*i.e.,* "systems of individualized assessments") – not when plaintiffs have gone farther and proven *actual* discrimination, which is especially difficult in land-use cases.  *See Sts. Constantine & Helen,* 396 F.3d at 900 ("[T]he 'substantial burden' provision backstops the explicit prohibition of religious discrimination in the later section of the Act," which is especially appropriate where "a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards."); *Midrash Sephardi,* 366 F.3d at 1225 (finding "individualized assessments" where zoning "officials *may* use their authority to individually evaluate and either approve or disapprove of churches and synagogues in *potentially* discriminatory ways") (emphasis added).  *See also* 146 CONG. REC. S7775 (daily ed. July 27, 2000) ("[I]ndividualized assessments [in denying zoning permits] readily *lend themselves* to discrimination, and they also make it difficult to prove discrimination in any individual case.") (emphasis added); *id.* at S7774 (Although discrimination sometimes appears on the face of zoning codes, "[m]ore often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'").  RMCC notes that, even if a showing of discrimination were somehow necessary to make out a § 2(a) claim, it made such a showing sufficient to avoid summary judgment.  (*See* Sections C.2, Hostility and Animus; C.3, Disparate Treatment).

[20]  (Ex. 4, Code, § 4-601A.1.2 (harmony, compatibility); 3 (accordance with Comprehensive Plan), 4 (not over-intensive use of land).

[21] *See* Int. Resp. No. 5 ("A determination of whether a particular proposal meets the County's special use criteria cannot be made in the absence of specific information about the nature of the proposal, including information about the site plan, impact, and location of the proposal.").

that same response indicates that additional, unspecified criteria may apply to the decision as well.[22]   Circumstances like these routinely satisfy the "individualized assessments" requirement.[23]  The County motion on this issue should be denied.

IV.     *Sixth Claim: County Violates RLUIPA's "Unreasonable Limitation" Provision.*

c., d.  <u>Supporting Facts</u>.   RLUIPA prohibits land use regulations that "totally exclude" or that "unreasonably limit religious assemblies, institutions and *structures within a jurisdiction.*"   42 U.S.C. 2000cc-2(b)(3) (emphasis added).  The unreasonable limitation provision "suggests an approach similar to the [free speech] 'reasonable alternatives' analysis."   *See* Robert W. Tuttle, "How Firm a Foundation? Protecting Religious Land Use After *Boerne*," 68 GEO. WASH. L. REV. 861, 903 (2000).  A factual dispute exists as to whether the County provides reasonable alternatives for larger churches requiring extensive structures.  Most importantly, the BOCC could not identify a single location in its jurisdiction in which a structure such as RMCC proposed could be located.  (Ex. 12, Def's Ans. to Interrogs. No. 5 at 1–2).  Any new religious structure requires site plan review if the occupant load is under 100, or special use review for all others.  (Ex. 2, BOCC Dep., 34-36).  Under either procedure, the County may deny for inconsistency with the Plan or incompatibility with the surrounding area.  (Ex. 4, Code, §§ 4-601.A.2 and 3, 4-806.A.2 and 15, 4-807.C.).   The conditions imposed by the County in site plan review are sometimes "too prohibitive."  (Ex. 3, Site Plan Review, "Limits of SPR").  Numerous policies limit development of all but the smallest churches in its jurisdiction, such as intergovernmental agreements restricting development in significant portions of the County, and various and overlapping Plan designations on

---

[22] *See id.* ("If a particular proposal at a particular location meets the County's special use criteria, *and any other applicable criteria*, then it would be allowed.") (emphasis added).

[23] *DiLaura v. Ann Arbor*, 30 Fed. Appx. 501, 510 (6th Cir. 2002) (denial of variance was "clearly" a system of "individualized assessments"); *Westchester Day*, 417 F. Supp. 2d at 542 (denial of permit to build religious school based upon "subjective" criteria was system of individualized assessments); *Living Water*, 384 F. Supp. 2d at 1130-31 (same).

731336.2 5:18 PM

which development is not supposed to occur.  (Koopmann Aff., Ex. 21, ¶¶ 29, 33-35).  During the planning process, the County imposes restrictive conditions and exactions that are difficult for many religious organizations to satisfy.  (*Id.* at ¶¶ 38-39).  The County has taken no steps to comply with Section 2 of RLUIPA, or even to determine patterns of religious attendance and the need for religious structures in its jurisdiction.  (Billingsley Dep., Ex. 23, 31-32).

RMCC does not claim that the bare requirement of undergoing special use review violates RLUIPA (*see* Mot., 19), but the County is required by RLUIPA to ensure that reasonable alternatives exist for religious organizations in its jurisdiction.  The most telling demonstration of its failure (and hostility) are its repeated arguments that RMCC should *leave the jurisdiction*, fulfilling its religious mission elsewhere.

V.      *Seventh and Eighth Claims: Federal and State Free Exercise*.

a., b.  <u>DISPUTED Burden and Elements</u>.  The facts support violations of free exercise under three distinct theories: (1) Substantial Burden – Individualized Assessments; (2) Substantial Burden – Hybrid Rights; (3) Discrimination.  The first two require a showing of a "substantial burden," plus a showing that they fit in one of the two exceptions to the general rule against "substantial burden" claims articulated in *Emplt. Div. v. Smith,* 494 U.S. 872 (1990).[24]  The standard for determining whether the "individualized assessments" exception applies under the Free Exercise Clause is the same as discussed above under RLUIPA.  And in the Tenth Circuit, a plaintiff need only make out a "colorable claim" that the challenged regulation also infringes other fundamental rights in order to fit within the "hybrid rights" exception.  *See Grace United*, 451 F.3d at 656.  Importantly, the Free Exercise discrimination claim does not require a

---

[24] *See Axson-Flynn,* 356 F.3d. at 1294 (describing "hybrid rights" and "individualized assessments" as two exceptions to *Smith* rule); *American Friends v. Thornburgh,* 951 F.2d 957, 960-61 (9th Cir. 1991) (same). *See also F.O.P.,* 170 F.3d at 364 (Alito, J.) (*Smith* distinguished, but did not overrule *Sherbert* cases).

showing of "substantial burden," as these are distinct strands in Free Exercise jurisprudence.   *See supra* note 18.[25]   A law on its face is neutral and generally applicable violates free exercise when applied in a discriminatory manner.  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (*citing Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953)).   Once RMCC makes out any of these three theories, it should prevail unless the BOCC satisfies strict scrutiny:   that its denial (i) serves a compelling governmental interest, and (ii) is the least restrictive means of furthering such interest.   *Grace United*, 451 F.3d at 656.   *See also Gonzales* v. *O Centro Espirita,* 546 U.S. 418 (2006) (applying strict scrutiny under RFRA).

c., d.   Supporting Facts.   RMCC has produced competent evidence supporting each element of all three theories, and the County cannot show, as a matter of law, that they have satisfied their especially heavy burden under strict scrutiny.  *See id.*

(1)   Substantial Burden – Individualized Assessments Claim.   Space constraints have imposed a "substantial burden" on RMCC's religious services, religious education, fellowship meetings, sermons, baptisms, weddings and funerals.   (*See* Section C.4. above).   And facts supporting that the burden was imposed through a system of "individualized assessments" are the same facts supporting the claim under RLUIPA Section 2(a), and are set forth in Sections III above.

(2)   Substantial Burden – Hybrid Rights Claim.   The facts establishing RMCC's colorable claim under other constitutional provisions are discussed in Sections VI through IX below, and the "substantial burden" facts in Section C.3 above.

---

[25] *See also Brown* v. *Mahaffey,* 35 F.3d 846, 849-50 (3d Cir. 1994) (laws that "target religious activity have never limited liability to instances where a 'substantial burden' was proved by the plaintiff," because "[a]pplying such a burden test to non-neutral government actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment."). *See, e.g., Peter* v. *Wedl,* 155 F.3d 992 (8th Cir. 1998) (finding religious discrimination in violation of Free Exercise Clause without examining extent of burden on religious exercise).

(3)    Discrimination Claim.  The facts supporting RMCC's facial and as applied Discrimination Claim are set forth in set forth in Sections II above.[26]

VI.    *Ninth and Tenth Claims: Federal and State Free Speech*.

a., b.    DISPUTED Burden and Elements.    The facts support findings of free speech violations under three separate tests.    First, RMCC may prevail by demonstrating the BOCC has applied the Code in a manner which discriminates in favor of other viewpoints ("Viewpoint Claim").  *Mesa v. White*, 197 F.3d 1041, 1047-48 (10th Cir. 1999); *People v. Aleem*, 149 P.3d 765, 779-80 (Colo. 2007).  This claim may be an as-applied claim.  *Id.*  Second, RMCC may prevail by proving that the Code or County practices require prior approval for expressive conduct (unless the BOCC proves the Code and County practices do not give its officials unbridled discretion) ("Prior Restraint Claim").  *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1283-84 (10th Cir. 2002); *see also 11126 Baltimore Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988, 995 (4th Cir. 1995) (even valid time, manner, place regulation subject to prior restraint challenge); *Edinburg Rest.*, 203 F. Supp. 2d at 873 (as-applied prior restraint).  Third, the BOCC correctly states the elements of a time, manner, place challenge ("TMP Claim"), but not the burden.  Once RMCC proffers facts showing that speech has been restricted, the BOCC bears the burden of showing that (1) the Code promotes a substantial governmental interest, (2) does not burden substantially more speech than necessary, and (3) leaves open adequate alternative avenues of expression.  *Abilene Retail #30, Inc. v. Bd. of Comm'rs of Dickerson Cty.*, ___ F.3d ___, 2007 WL 1982130, *4 (10th Cir. July 10, 2007); *Z.J. Gifts D-2 L.L.C. v. City of Aurora*, 136 F.3d 683, 688 (10th Cir. 1998).

---

[26] The BOCC wrongly describes many of the claims as facial.  (Mot., 20-22).  The Amended Complaint alleges both a facial and as-applied violation in the Seventh Claim.  The remainder of the claims allege only as-applied claims.  While unbridled discretion claims are most often facial claims, they may be as-applied claims.  *Edinburg Restaurant, Inc. v. Edinburg Tp.,* 203 F.Supp.2d 865, 873 (N.D. Ohio 2001).

c., d.  Supporting Facts.

(1)  Viewpoint Claim.  Applying the malleable provisions of the Code, the BOCC has preferred secular, Lutheran and Unitarian viewpoints over RMCC's viewpoint.  (*See* Section C.,2, Hostility and Animus, Section II, Equal Terms and Discrimination; Statement, Reply).  Most tellingly, the County's treatment of its own Heritage Center justified deviation from the Plan goal of preserving agricultural land based upon "educational benefit," while the educational benefits of RMCC's Sunday School educational program were not afforded the same consideration.  (*See* Statement, at 8-9; Reply, at 7).  This is sufficient evidence from which a jury could infer that the County has applied the special use criteria based on a dislike of the Church's message.  *See Mesa v. White*, 197 F.3d at 1047 ("evidence supports an inference . . . . [of] viewpoint discrimination").

(2)  Prior Restraint Claim.

> The sermon is the first and most enduring genre of American literature.  The essential medium of Puritan settlements, it continued in succeeding centuries to play a vital role — as public ritual, occasion for passion and reflection, and, not least, popular entertainment.

*American Sermons:  The Pilgrims to Martin Luther King Jr.*, front cover flap, (Michael Warner, ed., Library of America 1999).  In the County, *no* group may engage in this traditional form of speech without prior government approval.  (Ex. 2, BOCC Dep., 34-36).

A facial prior restraint claim must involve regulations having a nexus to speech. *Tool Box v. Ogden City Corp.*, 355 F.3d 1236, 1242 (10th Cir. 2004).  The nexus is present.  By their very nature, sermons require speaker and hearers to gather in one place.  As the Supreme Court has noted:  "'An individual's freedom to speak [and], to worship . . . . could not be vigorously protected from interference by the State [if] a

correlative freedom to engage in group effort toward those ends were not also guaranteed.'" *Smith*, 494 U.S. at 1602 (*quoting Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).   The prior restraint doctrine has been frequently applied to zoning special use permit schemes, since these required permits are the equivalent of licenses.[27]   In any event, *Tool Box* acknowledges laws lacking any nexus to speech are still subject to as-applied challenges.  *Tool Box*, 355 F.3d at 1243.

Because a prior restraint scheme exists, the BOCC must prove, that neither the Code nor the County's application of it vests officials with unbridled discretion. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (heavy presumption against constitutional validity of prior restraint).  At minimum, a fact dispute exists on this issue by virtue of the County's repeatedly changing the method by which it measures an over-intensive use for different applications; (*see* Statement at 4-7, treating requests for similar school gyms located in same district differently; (*see id.* at 7-8) commissioners ignoring criteria based on subjective determinations that First Amendment issue is involved; (*see id.* at 10-11), total lack of standards for when development located in buffer zone or on agricultural lands may be approved.  (Ex. 22, Ans. to Interrogs., No. 1, No. 2, Ex. A (listing multiple approvals in each category)).  The County's scheme gives it "substantial power to discriminate" and the ability to "suppress disfavored speech," signs of unbridled discretion.  *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1163

---

[27] *See, e.g.*, *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F. 3d 1358, 1361 (11th Cir. 1999) (zoning exception as license); *Hollywood Community Synagogue*, 436 F. Supp. 2d at 1336 (applying prior restraint to religious land use); *Casanova Ent. Group, Inc. v. City of New Rochelle*, 375 F. Supp. 2d 321, 335–36 (S.D.N.Y. 2005) (special use permit analyzed as prior restraint); *Diamond v. City of Taft*, 29 F. Supp. 2d 633, 647 (E.D. Cal. 1998) (conditional use permit as prior restraint); *3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F. Supp. 1268, 1275 (C.D.Cal. 1996) (applying prior restraint to general conditional use permit, separate from adult business specific ordinance). Special use permits are treated as licenses for prior restraint purposes. *See Nakatomi Invs., Inc. v. City of Schenectady*, 989 F. Supp. 988, 1002 (N.D.N.Y. 1997) ("A permit scheme qualifies as a prior restraint because it essentially requires the permittee to obtain the government's permission or approval before engaging in an act of First Amendment protected speech.").

(10th Cir. 2006).  With a zoning permit scheme that limits First Amendment activity, "virtually any amount of discretion beyond the merely ministerial is suspect.  Standards must be *precise* and *objective.*"  *Lady J Lingerie*, 176 F.3d at 1362.  Conditional use language similar to the Code's language has been found to impose an impermissible prior restraint.  *Franken v. Evanston*, 967 F.Supp. 1233, 1237 (D. Wyo. 1997) (CUP ordinance assessing whether use "is designed to be compatible with surrounding land uses").  The Code lacks standards sufficiently objective "so as to eliminate any possibility for content-based censorship."  *Santa Fe Springs Realty v. Westminster*, 906 F.Supp. 1341, 1365 (C.D. Cal. 1995).

(3)　　TMP Claim.  The substantial burdens described in Section C.4 above also raise a factual dispute as to whether the BOCC's regulatory actions burden substantially more speech than necessary to serve its interest.  The County also has not established as undisputed that the regulations in question serve a substantial governmental interest or that reasonable alternatives for speech exist.

The County quotes *Grace United* for the proposition that a substantial interest exists "in regulating the use of its land."  *Grace United*, 451 F.3d at 667.  The case does not establish a blanket rule covering all land use regulations.  Just this month, the Tenth Circuit, acknowledging the government interest in regulating secondary effects of adult businesses, remanded a case for a jury trial as to whether the regulations in question were designed to serve that interest.  *Abilene Retail #30*, ___ F.3d ___, 2007 WL 1982130 at **7, *11.  The BOCC cites no cases holding that preservation of agricultural lands and buffer zones are a substantial interest.  Factual disputes exist both as to whether the interests are substantial in this case and whether the regulatory actions are designed to achieve them given the BOCC's multiple approvals of development in these areas, (Ex. 22, Ans. to Interrogs., No. 1, No. 2, Ex. A), its prior designation of RMCC's

proposed site as a "future building site," (Ex. 17, Dev. Ag., Ex. A), and its designation of the property on a Plan map as a Public/Quasi Public facility. (Koopmann Aff., Ex. 21, ¶ 34).

Finally, the County must prove that ample alternative means of communication exist, and same evidence described in Section IV above supporting RMCC's unreasonable limitation claim creates a factual dispute as to this issue.

VII.    *Eleventh and Twelfth Claims: BOCC Violated Federal and State Petition Rights.*

a.    DISPUTED Burden. While RMCC has the initial burden of showing a *prima facie* case of retaliatory intent, or "circumstances which would give rise to a presumption of vindictiveness," the "burden then shifts to the [government] to establish objectively legitimate reasons for its actions." *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005).

b.    DISPUTED Elements. RMCC agrees with the BOCC's statement of elements with the caveat that under the "intent to retaliate" element, it need only show retaliation was a substantial, not the sole, motive. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

c., d.    Supporting Facts. The intent element is a classic jury question since proof "of an official's retaliatory intent rarely will be supported by direct evidence of such intent," *Mimics, Inc.*, 394 F.3d at 848. Indeed, questions of intent "seldom lend themselves to summary disposition." *Bloch v. Ribar*, 156 F.3d 673, 682 (10th Cir. 1998) (internal quotation omitted). The facts set forth in Section C.2. above are sufficient to allow a jury to infer retaliatory intent.

RMCC is not collaterally estopped by Judge Krieger's Order because the issue before Judge Krieger was lack of authority, not retaliatory intent, and, due to the abstention, there was neither an opportunity to litigate the issue nor a final adjudication.

*Burrell v. Armijo*, 456 F.3d 1159, 1172 (10th Cir. 2006).  If collateral estoppel applies, the determination that the County failed to establish that it had authority to sue RMCC is evidence from which retaliatory intent could be inferred.  (Order, Ex. P, 4-6).

VIII.    *Thirteenth and Fourteenth Claims: BOCC Violated Federal and State Association Rights.*

The BOCC addresses RMCC's freedom of association claims only in its discussion of facial challenges, (Mot., 20-22), and in conjunction with the free speech claims.  (*Id.* at 24-26).  The association claims are as applied, so the discussion of facial claims is irrelevant.  (Am. Comp., ¶¶ 236-243).  RMCC agrees that there is sufficient overlap between the free speech and freedom of association claims so that each violation of the Free Speech Clause described in Section VII above also constitutes a violation of the right of expressive association based upon the same evidence.  However, freedom of association is an independent right guaranteed "as an indispensable means of preserving other individual liberties."  *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984).  "Government actions that may unconstitutionally infringe upon this freedom can take a number of forms."  *Id.* at 622.  It has taken two forms in this case, each of which may only be imposed to serve a compelling state interest by the least restrictive means available. *See, id.* at 623.  The first is favoring the right of secular groups, Lutherans and Unitarians to associate over the right of an evangelical nondenominational group to do so.  (*See* Statement).  The second is requiring government approval before any group may assemble to engage in expressive association for religious purposes, (Ex. 2, BOCC Dep., 34:10–36:19), and imposing the more onerous special use process if the group exceeds 100.  The BOCC has offered no evidence concerning whether either of these actions serves a compelling governmental interest or are done by the least restrictive means, and therefore it is not entitled to summary judgment.

IX.    *Fifteenth and Sixteenth Claims: Federal and State Equal Protection.*

a.    <u>DISPUTED Burden</u>.    RMCC must initially prove its as-applied equal protection claim.  *Crider v. Bd. of Cty. Comm'rs of the Cty. of Boulder*, 246 F.3d 1285, 1288 (10th Cir. 2001).  However, once a classification made by the state has been shown, the burden shifts to the state to show that it meets "the appropriate degree of judicial scrutiny . . . ."  *Thompson v. Colorado*, 278 F.3d 1020, 1030 (10th Cir. 2001), *overruled on other grounds by Guttman v. Khalsa*, 446 F.3d 1027, 1034 (10th Cir. 2006).

b.    <u>DISPUTED Elements</u>.  An equal protection violation "occurs when the government treats someone differently than another who is similarly situated."  *Crider*, 246 F.3d at 1288 (quotation omitted).  When the government impedes a fundamental right such as religious exercise, strict scrutiny, not rational basis review, applies.  *See New Orleans v. Dukes*, 427 U.S. 297, 303 (1976); *cf. Harris v. Champion*, 15 F.3d 1538, 1568 (10th Cir. 1994) (whether a right is "a fundamental right depends on whether it is explicitly or implicitly guaranteed by the Constitution.")(quotation omitted).

c. d.    <u>Supporting Facts</u>.  The facts supporting these claims are set forth in Sections, C.2, Hostility and Animus, and II, Equal Terms and Discrimination, above.

Respectfully submitted this 25th day of July, 2007.

*s/ Thomas Macdonald*
Thomas Macdonald, #11394
Otten, Johnson, Robinson, Neff & Ragonetti, P.C.
950 17th Street, Suite 1600
Denver, Colorado 80202
Telephone:  (303) 825-8400
FAX:  (303) 825-6525
E-mail:    mac@ottenjohnson.com
Attorneys for Plaintiffs

731336.2 5:18 PM    34

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on July 25, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

dhughes@co.boulder.co.us
mgiaimo@rc.com
dmerriam@rc.com
tcarey@rc.com
peter.bryce@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner indicated by the non-participant's name:

Marci A. Hamilton, Esq. (US Mail)
36 Timber Knoll Drive
Washington Crossing, PA  18977

_s/ Margo Brown_
Margo Brown
Otten Johnson Robinson
 Neff & Ragonetti, P.C.
950 17th Street, Suite 1600
Denver, Colorado 80202
Telephone:  (303) 825-8400
FAX:  (303) 825-6525
E-mail:  mbrown@ottenjohnson.com

731336.2 5:18 PM