# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-CV-00554-REB-BNB

ROCKY MOUNTAIN CHRISTIAN CHURCH, a Colorado nonprofit corporation,
ALAN AHLGRIM, Lead Pastor,
DONALD BONDESON, Discipleship Pastor,
BARB EVANS, Director of Women's Ministry, and
DAVID PAGE, Elder,

      Plaintiffs,

and

UNITED STATES OF AMERICA, Intervenor,

      Intervenor Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, COLORADO,

      Defendant.

---

## RESPONSE TO BOULDER COUNTY'S
## FIRST COMBINED DISCOVERY REQUEST

---

Plaintiffs Rocky Mountain Christian Church, et al. ("Plaintiffs"), through their attorneys, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., hereby respond to Boulder County's First Combined Discovery Request as follows:

### PRELIMINARY STATEMENT

All of Plaintiffs responses are based upon such information and documents that are presently available to and specifically known to the Plaintiffs in responding to these interrogatories after reasonable investigation and in compliance with the Federal Rules of Civil Procedure. Plaintiffs will continue discovery and analysis that may uncover additional facts and

700364.1  JTMACD  11/6/06 3:55 PM

1)    Permit entry on to the Property for the purpose of inspection, measuring, and photography at a reasonable date and time as may be agreed to by the parties.

**RESPONSE**: Such entry will be permitted upon reasonable notice to Plaintiffs and at a mutually agreeable time.

2)    Permit entry on to the property owned by RMCC in Frederick, Colorado, for purposes of photography at a reasonable date and time as may be agreed to by the parties.

**RESPONSE**: Such entry will be permitted upon reasonable notice to Plaintiffs and at a mutually agreeable time.

## INTERROGATORIES

1)    Regarding members of the Church referred to in paragraphs 10, 11, 14, 16, 17, 132, and 135 of the Amended Complaint who were allegedly prevented from engaging in various religious exercises, identify those members and explain how and when each was prevented from engaging in those religious exercises.

**RESPONSE**: Plaintiffs object to this interrogatory on the basis that the undefined term "identify" is vague and ambiguous because it cannot be determined from the text of this interrogatory what level of detail the Defendants seek. Moreover, contention interrogatories are "overbroad and unduly burdensome on their face to the extent they ask for 'every fact' which supports identified allegations or defenses." Allianz Ins. Co. v. Surface Specialties, Inc., 2005 WL 44534 at *8 (D. Kan. 2005); see also Safeco of Am. V. Rawstron, 181 F.R.D. 441, 448 (C.D. Cal. 1998) (rejecting discovery requests seeking "all facts" because the "universe of potentially responsive information is almost endless"); Freedman v. Lincoln Nat'l Life Ins. Co., 2005 WL 2850307 at *1 (M.D. Fla. 2005)(contention interrogatories seeking "complete details of all facts and the identification of all documents" stricken because of overbreadth concerns). To state all facts supporting Plaintiffs' contentions set forth in paragraphs 10, 11, 14, 16, 17, 132 and 135 in a case centering on a process and conflict that has lasted approximately 9 years, has

involved a large number of people and agencies, and has generated an enormous amount of paper is overbroad, unduly burdensome, and ultimately not calculated to enlighten the Court or others. Plaintiffs therefore object to the scope of this interrogatory to the extent that Defendants seek an exhaustive list of all facts supporting this interrogatory. Plaintiffs will answer such interrogatories by setting forth only the "principal facts" supporting the relevant allegation. Allianz at *8 (citing IBP, Inc. v. Mercantile Bank, 179 F.R.D. 316, 320-22 (D.Kan. 1998). To the extent that the Court determines that further responses to such contention interrogatories are necessary, Plaintiffs intend to request that the Court, pursuant to Fed. R. Civ. P. 33(c), set the time for such additional responses at the end of the discovery process rather than at its outset.

Subject to the foregoing objections, Plaintiffs state that all members of the Church have been prevented from engaging in the religious exercise of worship due to lack of space at various times. For example, both the Sunday school classes and Christian educational space have reached capacity and the lack of additional space now limits the ministries that can be pursued and developed. Certain Church programs, such as Women in the Word, adult Sunday School, and Mothers of Preschoolers, cannot accept new participants due to lack of space.

Some children's Sunday School classes must be held in hallways due to lack of space, and the Church will soon be forced to turn away children from its Sunday School program due to the space limitations of the Church Building and due to safety and supervision concerns.

In the last 2-3 years, the growth of the Sunday School has resulted in shortened lesson times for the children and many children must be taught in a make-shift classroom located in the hallway. Because the lesson times have had to be shortened, all of the children that attend

Sunday school have had their religious exercise burdened by not being able to learn the lessons necessary to fully grow in the Church religion.

Overcrowding in children's ministry and adult education has caused the church to move from two longer services on Sunday to three shorter services. Thus, in order to schedule all three worship services on Sunday morning, the sermon delivered by Pastor Ahlgrim has been shortened from 35 minutes per week to only 25 minutes per week. Thus, a third of the time Pastor Ahlgrim, as leader of the Church, would have devoted to discussion of God's Word has been eliminated due to time constraints resulting from lack of space. This burdens the religious exercise of both Pastor Ahlgrim and all the members and non-members attending services.

Time for weekly communion and personal reflection has been shortened due to lack of time and space constraints. Moreover, in order move the communion process along more quickly, members of the congregation have been asked to move their seats during communion in order to expedite the communion process. The results of this disruption are that members, such as Donna Snyman, feel unwelcome and unable to fully worship at RMCC.

Also as a result of time constraints due to lack of space, the Church has been forced to move all public baptisms to the end of the third service, thereby preventing those members who attend the first two services from witnessing the blessing of baptism.

The Church is also prevented from blessing various speakers and missionaries during the services due to lack of time. Visiting teachers, ministers, artists, musicians and other speakers and performers cannot minister to the church body. For example, a Kids Hope USA regional representative, John Buechner, requested 5 minutes to present a promotional Kids Hope video clip to our congregation at the close of the worship services. His request was denied because of

time constraints that go along with scheduling three services into Sunday morning. Moreover, RMCC is unable to highlight its missionaries to its congregation. Missions is an important religious focus at RMCC. Thus, missionaries such as Jamie Ramge, a missionary in Bolivia, could not address the congregation personally due to the lack of time caused by space constraints.

Adult Sunday School classes have been reduced or eliminated to free up space to accommodate growth in the children's Sunday School classes. All adult Sunday school classes have been moved to temporary modular structures since 2004. As such many disabled and elderly persons are unable to attend classes in inclement weather and are not able to traverse the parking lot safely from the main building.

The Church cannot hold many fellowship events or accommodate all of those members who want to attend the fellowship events that are held. Some church groups have been forced to stop meeting altogether. For example, women's ministries are unable to accommodate the number of women wishing to attend their Thursday morning meetings. Other women's ministry groups, such as Women in the Word, Mothers of Preschoolers and Girlfriends Unlimited, have been turned away completely and forced to conduct their meetings in their homes. As an example, the women's ministry's board of directors have had to meet off-site because space is not available.

The time between services has been cut down significantly, thereby reducing the amount of connection that the members have with each other, the elders and their pastor.

Only one space in the Church's current facilities, the gym, can accommodate fellowship events for groups of between 100 to 300 people, and no space exists for fellowship events of

more than 300 people. Therefore, due to the intense competition for the gym's fellowship space, many fellowship events must be cancelled or scheduled at inconvenient times that prevent some members from attending. Upward Basketball games and practices are split between two different church gymnasiums located on opposite sides of town. This causes families to drive many extra miles when family members are on different teams practicing and playing games at different gyms.

Church members who desire to get married in their own Church often cannot do so and must find alternative space.

As stated above, the preceding response to Interrogatory No. 1 sets forth only the "principal facts" supporting the relevant allegations. Plaintiffs reserve the right to supplement this response as more information becomes available.

2) Identify all instances when the County and/or county representatives expressed animus toward the Church and/or toward the idea of religious education as specified in paragraphs 19 and 118 of the Amended Complaint. Include the specific contents of each expression of animus, the date such expression occurred, the location where such expression occurred, and the identity of the person who expressed such animus.

**RESPONSE**:

Plaintiffs object to this contention interrogatory requesting that Plaintiffs "[i]dentify all instances" on the grounds that it is overbroad and unduly burdensome on its face. See Plaintiffs' Response to Defendant's Interrogatory No. 1 *supra*. They also object to this interrogatory on the grounds that the term "identify" is vague and ambiguous in that it is undefined and therefore unclear what level of detail Defendant is requesting. See id. Pursuant to the Federal Rules of Civil Procedure, Plaintiffs will state only the "principal facts" supporting the allegation quoted by Defendant. *See id.*

Subject to their objections, Plaintiffs state that over a two-year period, the Board and other officials of the County engaged in an improper effort to thwart the Church's plans for its religious practices by, among other things, expressing animus toward the Church and toward the idea of religious education, announcing and implementing a policy designed to stop any growth of the Church, requiring the Church to provide voluminous and detailed information over and above the information required by the County's regulations governing special use applications and of a nature that has not been required of other applicants, and finally by suing the Church in the United States District Court for the District of Colorado (the "Federal Court") in an effort to chill the exercise of First Amendment rights by the Church and members of its congregation and by other religious groups.

The following actions reflect animus toward RMCC or religion:

• Although the existing Church Building and the expansion approved by Resolution No. 98-30 was entirely contained on the First Parcel, the resolution, as a condition of approval, required the Church to combine as one lot the First Parcel and the Second Parcel, and to enter into a development agreement pursuant to which the Church granted a 14-acre conservation easement on the northern portion of the Church property to the County without payment to RMCC.

• On November 26, 2004, on the Friday of the Thanksgiving holiday weekend and only six days prior to the hearing, the Church received a significantly revised and expanded Planning Commission Staff Report and Recommendation (the "Revised Staff Report") which raised concerns about the Application that had not been raised in earlier versions of the staff report. The Revised Staff Report was not an even-handed analysis of the Application, as

700364.1 ITMACD 11/6/06 3:55 PM                    14

required by the Code, but instead a brief against the Church's Application. The unusual nature of the Revised Staff Report evidences hostility to the Church.

- Although the Property is designated as a "Public/Quasi-Public Facility" on the Niwot Community Service Area Map, which constitutes part of the County's Comprehensive Plan, the Revised Staff Report irrationally compared the Church Building to residences, as opposed to comparing it to Niwot High School, located only 1,400 feet from the Property, and also designated as a "Public/Quasi-Public Facility" on the Niwot Community Service Area Map.

- At the November 7, 2005 hearing, the County land use staff again recommended denial of the Application. The County land use staff has consistently recommended denials of the Church's applications, with the exception of the small expansion of the storage building in Docket No. SU-00-21. Each time the County land use staff has recommended denial of an application filed by the Church, it has focused on subjective criteria, not subject to measurement or quantification, such as "compatibility." In reality, these stated reasons for denial were actually pretextual as is evidenced by the fact that the Board approves many applications even though the proposed development is to occur on lands designated as Agricultural Lands of National Significance or as within a buffer zone.

- At the November 7, 2005 hearing, the Board continued the hearing and requested that the Church submit a detailed description of the precise uses to which each area of the proposed addition would be put and of how such uses constituted a religious exercise. The additional information requested by the Board is not required by the provisions of the Code, and on information and belief, the Board has never requested such information from any other applicant in connection with any land use application.

700364 1 JTMACD 11/6/06 3 55 PM          15

In addition, the following statements contain expressions of animus by the County:

- During the course of the proceedings on the Application, Matt Morrison, a member of the Planning Commission, instructed RMCC planner, Rosi Koopman, in a sneering manner to "bring in your Christians," referring to Christians in a disparaging manner. This occurred at the Planning Commission Hearing held at the County Courthouse on September 15, 2004.

- Also during the course of the proceedings on the Application, members of the Board viewed videotape depicting RMCC's Sunday school program. Upon viewing videotape of the Sunday school, Commissioner Tom Mayer, whose father was a Sunday school superintendent, stated that "My father would be rolling over in his grave."

- Also at the Planning Commission hearing on the Application held on September 15, 2004, Matt Morrison, a member of the Planning Commission, frankly acknowledged that a long-standing goal of the County is to stop the growth of the Church, stating that the County has been trying to stop the growth of RMCC for the last ten years and when is the Church going to "get the message."

- In both the Oral Denial and the Written Denial, the Board directed the County attorney to sue the Church in federal district court to determine "whether the [Board's] decision on the [Application] complies with the mandates of the federal Religious Land Use and Institutionalized Persons Act."

- Each of the stated grounds for denial of the Application was a subjective criterion applied inconsistently by the Board as it suits the purposes of the Board. For example, the County land use staff recommended denial of the 1997 Application on each of the same grounds and recommended denial of the 2002 Application on some of the same grounds.

- In the hearing in front of the Planning Commission for the modular temporary structures, Planning Commissioner Matt Morrison made several derogatory comments concerning religious education.

- Statement made to Gina Hyatt of Har Ha Shem, a synagogue located in Boulder County, by Paul Danish, them County Commission of Boulder County, that there won't be any more mega-churches in Boulder County, referencing Vine Life Church.

As stated above, the preceding response to Interrogatory No. 2 sets forth only the "principal facts" supporting the relevant allegations. Plaintiffs reserve the right to supplement this response as more information becomes available.

3)    Identify all materials or information you relied on as the basis for the allegation in paragraph 68 of the Amended Complaint that "Members of the Board were unhappy that BVCC was able to develop in their jurisdiction" and that the County adopted Section 4-102(F) of the Code "in response to the BVCC development."

**RESPONSE**:

Plaintiffs object to this contention interrogatory requesting that Plaintiffs "[i]dentify all instances" on the grounds that it is overbroad and unduly burdensome on its face. See Plaintiffs' Response to Defendant's Interrogatory No. 1 *supra*. They also object to this interrogatory on the grounds that the term "identify" is vague and ambiguous in that it is undefined and therefore unclear what level of detail Defendant is requesting. *See id.* Pursuant to

Additionally, statements by County representatives belie any desire on its part to comply with RLUIPA. The County attorney, David Hughes, was quoted in the June edition of the *Left Hand Valley Courier* as stating: "So, in the long term, the county would like to see RLUIPA declared unconstitutional or substantially modified by Congress."

See also Plaintiffs' Responses to Interrogatory Nos. 1 and 2 above.

13) For each religious activity that you applied for in the Application, identify whether that use must take place on the Property as opposed to another location and explain why.

**RESPONSE**:

Plaintiffs object to this interrogatory to the extent that it presumes that other locations within Boulder County exist where RMCC could hold services. Plaintiffs also object to this interrogatory's mischaracterization of the Application as applying for "religious activity" – a term undefined by Defendants. In reality, the Application sought approval of a special use amendment to allow a balcony to be added in the church sanctuary bringing the total seating to 2400 and an addition to the west of the existing structure for expansion of the church, Sunday school and school classrooms increasing the total maximum number of elementary and middle school students from 380 to 540.

As revealed at the hearing held in front of the Board on November 7, 2005, multiple core religious activities of the Church are substantially constrained and burdened by the current lack of space. These include the following religious activities:

Worship:

• It is impracticable and detrimental to families and children for the church to schedule additional Worship services to meet the needs of its congregation. An additional service has been

added on Sunday morning. The Church cannot dictate to its congregation when they shall worship, and the 9:30 a.m Sunday service is by far the most popular and space restricted.

• The Children's Sunday School program is filled beyond capacity, but demand for these programs continues. Some children's worship times must be held in hallways due to lack of space, and other large-group worship times for children take place in very crowded rooms. For safety reasons, the Church may soon be forced to turn away children from Sunday School programs when a room fills to capacity. Additionally, a desire to maximize every bit of available space for Children's Sunday School has resulted in Children's Sunday School classes being held in multiple locations throughout the Church's facilities rather than one central location, creating safety issues, security concerns and logistical challenges.

Fellowship:

• Many of the Church's small religious groups meet in Church members' homes due to the lack of space at the Church. The lack of space on Sunday morning at the Church has caused some groups to stop meeting altogether. The lack of space on Sunday morning has caused adult classes to be cancelled in order to accommodate more children's Sunday school classes. Some of the adult programs not cancelled now meet in individual homes during the week.

• Developing meaningful relationships through casual fellowship experiences is central to cultivating a healthy religious community. Extremely crowded hallway conditions outside of the Worship auditorium make Christian fellowship prior to and after worship services impracticable.

• Only one space in the Church's existing facilities – the gym – can accommodate fellowship events for groups of 100-300 people, and no space exists for groups larger than 300. The worship auditorium is not conducive to fellowship activities. Because the gym is used for

multiple purposes and "competition for that space is intense," the existing gym is often either unavailable or inadequate for Church fellowship events. Therefore, many events must be cancelled or scheduled at inconvenient times.

• Fellowship is one of several core reasons that people join a church, and nearly all churches contain fellowship hall space to accommodate the gathering of at least half of their church's congregation for banquets, pot-lucks, and similar fellowship activities. Accordingly, larger churches require larger fellowship halls. While a general rule of thumb in church space allocation is that the fellowship hall space shall be roughly equal to the sanctuary or worship space, the Church's current ratio of fellowship space to sanctuary space is nowhere near this standard ratio. As stated above, there is no space within the Church's existing facility to accommodate fellowship events for more than 300 people.

Discipleship:

• Certain religious programs such as Mothers of Preschoolers and Women in the Word have had their attendance capped due to lack of space, despite great demand for these programs.

• Adult Sunday School classes have been moved from the main building and reduced and/or eliminated to free up space to accommodate growth in the Children's Sunday School program. What was once a primary avenue to integrate new adult members into the Church community and to grow them in their faith no longer exists due to the space constraints of the Church's existing facilities.

• The high number of children in early childhood Sunday School classes creates conditions that violate commonly accepted per-child square footage ratios. These space constraints limit certain types of age-appropriate religious programming and religious education activities.

700364.1 JTMACD 11/6/06 3:55 PM                        30

Ministry:

• Weddings greater than 100 people cannot be held at optimum times, and wedding reception space is often not available. Because weddings cannot be coordinated at optimum times due to heavy use of the Church facilities, Church members who desire to get married in their own Church often cannot do so and must find alternate space.

• Because the current gym is filled beyond capacity during the Upward Basketball program conducted in conjunction with the Church's Saturday Sports Ministry, the Upward Cheerleading program must be held in the hallways.

Evangelism:

• A key evangelism tool is opening the facility to community groups free of charge. Due to a lack of meeting space, the Church must turn away community groups who ask to meet in the building. As Church ministries grow, more community groups will be turned away and/or displaced.

• One of the most common requests from community groups is for banquet space that can accommodate groups greater than 100 people. As previously mentioned, only one such space currently exists in the Church, and it is heavily scheduled and over-used. Community groups that the Church accommodated just a few years ago are no longer able to meet due to the space not being available at the times they need it.

Each of these religious activities must take place on the Property as opposed to another location. Indeed, as outlined in the Bylaws of Rocky Mountain Christian Church, the "primary purpose of Rocky Mountain Christian Church is to exalt Jesus Christ, impacting Boulder County and beyond, by bringing people to Christ, building them up in the faith, and

sending them out to make a difference in their world." See Bylaws at Art. II, sec. 1. RMCC's calling to ministry is therefore particular to Boulder County and its people. Equally important to RMCC's primary purpose is its mission to be a full family ministry, thereby able to meet the needs of its congregation in one location for the purposes of worship, ministry, evangelism, discipleship and fellowship. Moreover, off-site options for these religious activities are infeasible due to the logistical difficulties of requiring members of families to attend Sunday services and programs at different locations, thereby requiring families to split apart for worship and fellowship.

**14)** For each Request for Admission that you do not unconditionally admit, please describe with specificity your reasons for denial or partial denial.

**RESPONSE**: The reasons for denial or partial denial are contained in each Request for Admission.

## REQUESTS FOR ADMISSION

1) Admit that RMCC plans on opening an East Campus in Fredrick, Colorado.

**RESPONSE**: Admitted.

2) Admit that the East Campus is approximately 12.5 miles away from the Property.

**RESPONSE**: Admitted.

3) Admit that RMCC plans to extend its ministry by becoming a multi-site church.

**RESPONSE**: Admitted with qualification. RMCC admits that it intends to extend its ministry by becoming a multi-site church, with each site modeled to provide a full-family ministry for that community.

4) Admit that RMCC's vision in its Imagine Campaign is to "double the influence of our ministry."