# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-CV-00554-REB-BNB

ROCKY MOUNTAIN CHRISTIAN CHURCH, a Colorado nonprofit corporation,
ALAN AHLGRIM, Lead Pastor,
DONALD BONDESON, Discipleship Pastor,
BARB EVANS, Director of Women's Ministry, and
DAVID PAGE, Elder,

      Plaintiffs,

and

UNITED STATES OF AMERICA, Intervenor,

      Intervenor Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, COLORADO,

      Defendant.

---

## AFFIDAVIT OF ROSI KOOPMANN

---

Affiant, being duly sworn, deposes and states as follows:

1.    I am a professional land use planner. I have represented Rocky Mountain Christian Church (the "Church") in connection with its various applications before the Board of County Commissioners of Boulder County ("Board").

2.    I worked for the Boulder County Land Use Department for approximately 12 years, and in that capacity, served as the planner for special use reviews and site plan reviews. Since being a County's employee, I have been a planning consultant for over 12 years working with applicants in Boulder County (the

"County"). I have represented numerous religious organizations attempting to get land use approvals in the County.

3.      Based on this experience I am familiar with the provisions of the Boulder County Land Use Code (the "Code") and the Boulder County Comprehensive Plan (the "Plan").

4.      I acted as the planner for Rocky Mountain Christian Church ("RMCC" or the "Church") in connection with a number of special use approval applications filed by RMCC with respect to its property located at 95th and Niwot in the unincorporated portion of the County (the "Property"), including SU-04-008 (the "Application"). I am familiar with the Application and the County's processing of it.

5.      Section 1-400 of the Code provides that the Code applies to all land within unincorporated Boulder County, and Section 1-300 provides that the Code governs "the use and development" of such land.

6.      Under Section 4-506.B, the Code defines a "church" as "a facility principally used for people to gather together for public worship, religious training, or other religious activities."

7.      Although churches with seating for less than 100 people and not exceeding certain other limitations are listed as a use by right in 12 out of 13 zone districts, before a religious organization may begin conducting church services anywhere in unincorporated Boulder County, a congregation must first obtain County approval of a site plan for its facility through an administrative review process.

2

8. In the Forestry District, which covers more than half the county, churches are excluded altogether.

9. If the size of the proposed church meets certain triggers, including having an occupant load of 100 or more, the congregation must obtain special use approval from the County before conducting services.

10. In my experience, almost any church will require special use approval.

11. Under Section 3-201.A.1 of the Code, before beginning either the site plan or special use application process, an applicant must have a preapplication conference with a planner in the County's Land Use Department and bring a conceptual site plan to the meeting.

12. Under Section 3-201.A.2. of the Code, the planner may require the applicant to meet with other County departments if the proposal raises certain issues.

13. Section 3-202.A.14 of the Code specifies the submittal requirements for the site plan review process include a completed application form and fee, a vicinity map and a site plan. The County Site Plan Review Checklist specifies additional submittal requirements, as determined by the pre-application planner, that include either a letter of building lot determination from the County Land Use Department or deeds for the lot from July 6, 1995 to present and a copy of the current deed, location map, fact sheet with calculations of proposed structure square footage and amount of grading (cut and fill), structure elevation drawings, referral agency packets, revegetation/erosion control plan, lighting plan for all exterior lighting, color

3

731315.2 JTMACD 07/24/07 12:26 PM

chips/samples of exterior roofing and siding colors, and wildfire mitigation plan. The checklist specifies that a site plan includes existing features (such as existing improvements, vegetation, and geographic features) and proposed improvements (such as structures, utilities, roads, grading areas of cut and fill, parking, setbacks, and landscaping). Other items that may be required for the site plan review include an inventory of cultural resources (archaeological/historical), grading cut and fill calculations by a certified engineer, legal access verification, traffic calculations by a certified transportation engineer, occupant load calculations, daily wastewater flow calculations, and narrative description of proposed use.

14.    If the proposal includes alteration to an existing structure or site that County staff determines has historical value, the proposal may be subject to the historic review process which includes review by the County Historical Preservation Advisory Board and may result in a 180-day stay on the building permit application.

15.    If the proposal includes grading which exceeds 500 cubic yards of cut and fill, a limited impact special review is required.

16.    Under Section 3-203.E.2. of the Code, the site plan must be a detailed map drawn to scale depicting a great amount of detail concerning both the existing property and the proposed development. County handouts require even additional information. .

17.    Because the site plan must depict certain land survey information and improvement plans, Section 3-203.B. of the Code requires certification of certain aspects of the plan by both a professional engineer and a professional surveyor.

731315.2 JTMACD 07/24/07 12:26 PM

18.    Section 3-202.A.15. of the Code specifies the submittal requirements to start a special use review which include all of the items required for site plan review, plus a development report, adjacent property owner referral packets, a development agreement, mineral estate owners or lessees certification, and a title report.

19.    Any of the review processes may require engagement of professional consultants including a certified engineer for improvement plans and reports for water and sewer service, drainage, and grading; a registered land surveyor for the site plan; a registered geologist for geology reports; a County approved wildlife expert for wildlife impact reports; a licensed architect for building plans and elevation drawings; a certified transportation engineer for traffic studies, and an attorney for development agreement and conservation easement. Although not required by the County, most church applicants will engage a planning consultant to assist with the County review process.

20.    Section 3-203.F. of the Code states that the development report must contain an address list of all adjacent landowners, and descriptions of site features such as streams, lakes, areas subject to flooding, high ground water areas, vegetative cover, climatology, soil characteristics, geologic characteristics, utilities, environmental effects of the development, plans for an adequate and safe sanitation system, the long and short-term effect on flora and fauna determined through field surveys and expert opinions, the effect on significant cultural resources and environmental resources such as critical wildlife habitat, an evaluation of potential radiation hazards, an evaluation of

5

the expected demands and effects of the proposed development on public service providers, and an assessment of transportation impacts. County handouts require even additional information. Preparing the development plan requires studies prepared by civil engineers, architects, traffic engineers, and sometimes a landscape architect. Once all of these studies have been prepared it generally takes approximately ten hours to prepare a development report.

21.    Under Section 3-203.H. of the Code, referral packets are to be mailed to all landowners within 1,500 feet of the property and to various referral agencies and must include one copy of the site plan and application. Often times County staff also requires applicants to include a vicinity map and development report.

22.    Site plan review procedures and criteria are set forth in Sections 4-800 through 4-811 of the Code.

23.    Site plan review is required, pursuant to Sections 4-802.A 1,2. and 10 of the Code, in numerous circumstances, including for any development requiring a building permit on a vacant parcel, any cumulative increase in floor area of an existing building of more than 1,000 square feet, or any change in use of a parcel of property.

24.    Pursuant to Section 4-807 of the Code, the Director makes the initial determination of whether to approve, approve with conditions or deny a site plan review application.

25.    However, under Section 4-809 of the Code, the Board, on its own initiative, may elect to review any aspect of a site plan review determination at a public hearing and make its own decision on the application.

6

26.    According to Section 4-811 of the Code, no change to an approved site plan will be allowed unless the Director determines that it does not constitute "a substantial modification," or an application to amend has been submitted and approved in accordance with the provisions governing the initial approval.

27.    In Section 4-806.A, the Code sets forth fifteen separate standards governing site plan review, and then states "[w]hen two or more of the standards listed below conflict, the Director shall evaluate the applicability and importance of each of the conflicting standards under the facts of the specific application and make a reasonable attempt to balance the conflicting standards in reaching a site plan decision."

28.    The specific standards in Sections 4-806.A 1,2,8,10,14 and 15, include requirements that the location of the proposed buildings or structures not impose "an undue burden" on public services and infrastructure, that the height, size, location, exterior materials, color and lighting of the proposed structures must "be compatible with the topography, vegetation, and general character of the applicable neighborhood or surrounding area", that the development avoid lands designated in the Plan as agricultural lands of local, state or national significance, that the development not have a "significant negative visual impact on the natural features or neighborhood character of surrounding areas," that any new principal structure replacing an existing structure is proposed to be replaced with a new principal structure, the new structure shall not cause a "significantly greater impact," and that the proposal "shall be consistent with the Comprehensive Plan, any applicable intergovernmental agreement affecting land use or development and the Code.

7

29.    The requirement that a site plan be consistent with the Comprehensive Plan and any applicable intergovernmental agreement makes it difficult, if not impossible, to develop churches in large areas of the county.

30.    Special use procedures and criteria are set forth in Section 4-600 though 4-604 of the Code.  Additional procedures described in Sections 3-205.B and C of the Code, require public hearings on the application before both the Planning Commission, which makes a recommendation to the Board, and the Board, which makes the final determination.

31.    Under Section 4-603.A. of the Code, no change to an approved special use will be allowed unless the Director determines that it does not constitute "a substantial modification," or an application to amend has been submitted and approved in accordance with the provisions governing the initial approval.

32.    Special use criteria are set forth in Section 4-601 of the Code, which provides that the Board shall not approve a proposed use unless it meets certain subjective criteria, including that it:  (a) "will be in harmony with the character of the neighborhood and compatible with the surrounding area;" (b) "will be in accordance with the Comprehensive Plan;" and (c) "not result in an over-intensive use of the land or excessive depletion of natural resources."

33.    The requirement that a proposed use be in accordance with the Plan is especially subjective given that the Plan, itself, states that it is "advisory in nature" and "provides guidance in the decision-making process, but not the 'final word.'"

731315.2 JTMACD 07/24/07 12:26 PM

The requirement is inconsistently applied with respect to Plan goals such as preserving lands designated as Agricultural Lands of National, State and Local Importance.

34.    The requirement is further inconsistently applied when the County places more emphasis on one element of the Plan than another or completely ignores a Plan designation, such as the public/quasi-public designation on the RMCC property.

35.    The Plan states as a goal that "[a]dequate facilities and services which provide diverse educational, cultural and social opportunities should be encouraged." Although this goal is relevant to proposed new churches, it is rarely if even mentioned or considered by the County in connection with applications by religious organizations.

36.    Under Sections 4-603.A and 4-811, an existing congregation that wants to make any substantial change to accommodate new members or new expressive activities must also obtain County approval either through site plan review or special use review.

37.    Section 18-207 of the Code defines a substantial modification as "a change which significantly alters the impacts and/or character of a structure, development or activity."

38.    Over the years the County Commissioners have added regulations to the County Land Use Code and implemented informal practices making it extremely difficult for any church or religious school to locate, operate, or expand in the County's jurisdiction. I have, as a planning consultant, worked with numerous churches seeking County approval and have experienced first hand the kinds of concessions churches

have to make in order to receive County approval to operate. These concessions may include structure size restrictions, reduction in number of people, and conservation easements granted to the County on the undeveloped portions of the properties.

39. In addition to the concessions RMCC has had to make in their expansion proposals, Columbine Unity Church and St. Luke Orthodox Christian Church are examples of other churches that also had to made concessions. Specifically, Columbine Unity Church (SU-01-01) was approved for 160 people and 12,630 sq. ft. when the original proposal was for 200 people and 16,500 sq. ft. St. Luke Orthodox Christian church was approved for an increase from 120 to 216 people and from 4,200 sq. ft. to 6,930 sq. ft. when the proposal was for 250 people and 8,228 sq. ft. City on the Hill is a church that has been in the County's special review process for years but has not yet found the correct set of concessions needed to obtain a County staff recommendation of approval to proceed through the special review process.

40. Expansions of large churches in the County that were not required to go through special review were the impetus behind the County Commissioners changing the Code in 1994 to add more triggers for special review (if use generates traffic volumes in excess of 150 average daily trips per lot, has an occupant load greater than or equal to 100 persons per lot, has a total floor area greater than 25,000 square feet, and/or has a second principal use which does not increase density). Prior to that time, churches were allowed by-right and only sanitation systems with a wastewater flow greater than or equal to 2,000 gallons per day per lot were required to go through

731315.2 JTMACD 07/24/07 12:26 PM

10

special review.   Since 1994, if a church exceeds any of the previously mentioned parameters, a special review process is required.

41.    In 1997, the County Commissioners removed churches entirely as a use by-right in the forestry zoning district which covers more than half of the County. Existing churches became non-conforming because of that regulatory change. Modification to or expansion of these churches requires a rezoning review to Mountain Institutional zoning, as well as a special review if any of the triggers are hit.

42.    Colorado State Statute 30-28-106 states, "It is the duty of a county planning commission to make and adopt a master plan for the physical development of the unincorporated territory of the county." The BCCP identifies agricultural land as the County resource of highest value to preserve over any other, but the Plan does not include any consideration of the religious needs of County residents.   The petition of support for RMCC's proposal from numerous churches in the County which was presented to the County Commissioners in the RMCC public hearing, represents thousands of congregants in the County, and demonstrates the need for religious facilities in the County.

43.    Through additional amendments to the Code, the County Commissioners have reduced reviews for some uses other than churches.   For example, County government trailheads that generate more than 150 average daily trips are subject to limited impact special review (an abbreviated review process). Agricultural uses with structures that total more than 25,000 sq. ft. in size (such as indoor riding arenas) are also subject to limited impact special review.   Whereas,

11

731315.2 JTMACD 07/24/07 12:26 PM

churches that generate more than 150 average daily trips or 25,000 sq. ft. are required to go through a full special review process.

44.     During my representation of the Church, I had a meeting with Graham Billingsley, the County Land Use Director, concerning the Application in the Spring of 2005.  The Church's attorney, Thomas Ragonetti, also attended the meeting. During the meeting, Mr. Billingsley indicated that the primary concern that County staff had with the Application was the request to increase school attendance at the Rocky Mountain Christian Academy from 380 to 540 students because of increased weekday traffic that would be generated.  Mr. Ragonetti and I left the meeting with the impression that if the Church would drop that portion of the Application, most if not all of the County's concerns would be resolved.  In response to Mr. Billingsley's comment, the Church did drop the request to increase the number of students.

Further affiant sayeth naught.

DATED: _____7 / 24_____, 2007.

_____
ROSI KOOPMANN


STATE OF COLORADO          )
                           ) ss
BOULDER COUNTY             )

The foregoing instrument was sworn before me this __24th__ day of July, 2007, by Rosi Koopmann concerning the above-captioned matter.

Witness my hand and official seal.   _____

My commission expires: __12/17/2008__          Notary Public

12

731315.2 JTMACD 07/24/07 12:36 PM